## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ ) | |
| **DAVID DEL VILLAR,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 09-cv-1135 (RMC)** |
| ) | |
| **FLYNN ARCHITECTURAL FINISHES,** ) | |
| **INC.,** *et al.,* ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| _____ ) | |

## OPINION

David del Villar has a specialized skill in oxidizing architectural metals to refinish
them to their original appearance. He was hired by Flynn Architectural Finishes, Inc., because it
had two contracts with the United States Government that required such a skill. Mr. del Villar
was fired partway through the second of these contracts. He alleges in Count II of his Complaint
that he was fired for complaining that he was not paid "the Government wages" as required by
the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et. seq.,* and/or the Davis-Bacon Act, 40 U.S.C.
§§ 3141, *et. seq.* Mr. del Villar also raised, at trial, a claim under the D.C. Wage Payment and
Collection Law, D.C. Code §§ 32-1301, *et seq.,* for unpaid wages because he was paid less than
Davis-Bacon required. Flynn Architectural and its owner, Christopher Flynn, assert that Mr. del
Villar was fired because he did not get along with his coworkers and he would not reveal what
chemicals he used in his oxidizing work. They conceded at trial that Mr. del Villar may be owed
some outstanding wages, but this point remains unproven.

This is a tale of mis-communication, not retaliation.  Furthermore, Mr. del Villar failed to present the Court with sufficient evidence to support an award of lost wages. Accordingly, as explained below, judgment will be entered in favor of Defendants on Count II and the alleged D.C. Code violation will be dismissed with prejudice for failure to prosecute.[1]

The Complaint in this case clearly articulates an alleged wage violation under the Fair Labor Standards Act ("FLSA") and a claim for retaliation under the Act.  Compl. [Dkt. 1] Counts I, II.  The retaliation claim in Count II was tried as a claim for retaliation under the FLSA for complaints Mr. del Villar made regarding his wages under the Davis-Bacon Act.  The FLSA establishes a national minimum wage and guarantees time-and-a-half for hours over 40 in a week in many jobs.  *See* 29 U.S.C. §§ 206(a), 207(a).  Supplementary to the FLSA is the Davis-Bacon Act, which requires "that laborers and mechanics under covered government contracts will be paid at least the prevailing wages for corresponding classes in the area of performance of the contract as determined by the Secretary of Labor."  *Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447, 1449 (D.C. Cir. 1994).   It applies "to every contract in excess of $2,000, to which the Federal Government or the District of Columbia is a party, for construction, alteration, or repair, including painting and decorating, of public buildings and public works of the Government or the District of Columbia."  40 U.S.C. § 3142(a).  Notice of the change from the Complaint's focus on FLSA to trial on Davis-Bacon escaped all parties.

Mr. del Villar points to no provision allowing a private right of action for retaliation under the Davis-Bacon Act.  The Court decides Mr. del Villar's claims as he pled

---

[1] Mr. del Villar's claim in Count I was resolved at summary judgment.  *See* Mem. Op. [Dkt. 29].

them, under the FLSA.

# I.  FINDINGS OF FACT

After a bench trial, the Court enters the following findings of fact and conclusions of law.

## A.  Stipulations

1.      David del Villar worked for Flynn Architectural from approximately March to July 2008 as a metal refinisher.

2.      Flynn Architectural assigned Mr. del Villar to work on three federal construction contracts that were covered by the Davis-Bacon Act: contracts at the Navy Medical Research Center in Bethesda, Maryland ("Navy Project"), the United States Capitol ("U.S. Capitol Project"), and the Visitor's Center at the Federal Bureau of Investigation ("FBI Project") in the summer of 2008.

3.      Mr. del Villar was terminated on July 17, 2008.

4.      Christopher Flynn, owner of Flynn Architectural, told Mr. del Villar that the reason for his termination was that Mr. del Villar did not get along with his co-workers and that he would not tell Flynn Architectural which chemicals he used to perform his oxidizing work.

5.      Flynn Architectural is located in Silver Spring, Maryland; it specializes in refinishing architectural metal, wood and stone elements in commercial buildings.

6.      Christopher Flynn is the owner and president of Flynn Architectural; he owns 80 percent of the company.

7.      Flynn Architectural has been in business for over 25 years and employs

approximately 33 people.

**B. Flynn Architectural**

8.      Flynn Architectural works mostly on continuing maintenance contracts in

commercial buildings.  Work on these contracts is done at night to refinish wood,

stone and/or metal.  Trial Tr. 5-6, July 26, 2011 (Collins) ("Tr. II").  Multi-year

maintenance contracts constitute about 65% of the company's work while non-

maintenance, or one-time jobs, constitute about 35%.  *Id*. at 6.  Flynn

Architectural works between 800 and 1,000 jobs each year.  Tr. II at 42-43

(Wingreen).

9.      Flynn Architectural is thinly staffed at the management levels.  Mr. Flynn is

owner and president; he does all bidding and runs the business.  Mr. Flynn  also

visits job sites frequently.  Edison Collins is vice president of production.  Mr.

Collins works in Flynn's office, not the field, managing a database that captures

all of the work for the metal and stone divisions; scheduling the work for all field

technicians on a weekly basis; and reviewing time cards for accuracy.  Tr. II at 3-5

(Collins).  Patricia Wingreen is the office manager; among other duties, she runs

payroll.  *Id* at 4.  Flynn Architectural has one field supervisor, Samuel Robles,

who generally travels from job site to job site during the evening to oversee the

field work.  Trial. Tr. 160, July 25, 2011 (Robles) ("Tr. I").  Each job has one or

more foremen.  Employees working under a foreman are called helpers.[2]  Tr. I at

---

[2]  At the time of trial, Flynn Architectural had 29 technicians, of whom 16 were foremen and 13 were classified as helpers.  Tr. II at 33 (Collins).

24 (Flynn).  All employees who work in the field are called technicians.  Tr. II at

16 (Collins).

10.    None of the maintenance contracts held by Flynn Architectural is covered by the

Davis-Bacon Act and its requirement that a government contractor pay the

"prevailing wage."  *Id*. at 6.  Only a minimal amount, approximately one percent,

of "one-time" jobs done by Flynn Architectural are for the federal government and

thereby covered by Davis-Bacon.  *Id*. at 6-7.

**C.  Mr. del Villar's Work at Flynn Architectural**

11.    Christopher Flynn himself interviewed and hired Mr. del Villar.  Having lost two

metal refinishers who were skilled in oxidizing, he was glad that Mr. del Villar

had that skill.  Mr. Flynn did not ask Mr. del Villar what chemicals he used for

oxidizing.  Tr. I at 25 (Flynn) ("[W]e hired David [del Villar] because we had an

oxidizing job that was coming up and we had recently had lost two technicians

[whose] specialties were oxidizing so we hired David specifically for the

oxidizing jobs.").

12.    Oxidizing is "a method of turning the color of . . . metal."  *Id*. at 47.  It is basically

"a catalyst that accelerates the surface color of a metal."  *Id*.  It is a specialized

field because there is a variety of chemicals that might be used for oxidizing and

"depending on what chemicals you use and how long the chemical stays there

[and] whether you neutralize it," the result will be different hues in the metal.  *Id*.

Mr Flynn testified: "it really is a unique process . . . [and t]here are a lot of factors

that go into oxidizing."  *Id.* at 47-48.

13.     Mr. del Villar worked on approximately 20-30 jobs as a helper[3] before he worked

        on any government contracts for Flynn Architectural.  *Id*. at 22, 48.  The Navy

        Project was not an oxidizing job, and Mr. del Villar continued to act as a helper

        on this job, but it was for the federal government and therefore "prevailing wages"

        had to be paid.  The U.S. Capitol and FBI Projects required an expert refinisher

        with oxidizing skills, and Mr. del Villar was assigned to do that work.  *Id*. at 37.

        **D.  The Navy Project**

14.     Flynn Architectural had a one-time contract to sand and refinish stainless steel and

        brass at the entrance to Bethesda Naval Hospital in Bethesda, Maryland, just

        outside D.C.  The job needed to be completed in two days.  Tr. I at 58-60 (del

        Villar).

15.     There was no oxidizing work on the Navy Project, and Mr. del Villar worked as a

        helper on this job.  Tr. I at 37, 48 (Flynn).

16.     Flynn Architectural paid its field technicians on the Navy Project a "piecework

        rate," rather than an hourly rate.  In this context, a piecework rate meant a lump

        sum, intended to be greater than the applicable hourly rate as an incentive to finish

        the job quickly.  If a job takes longer than expected, technicians may elect to

        receive their hourly rates instead.  Tr. II at 8 (Collins).

17.     The piecework rate for the Navy Project may have been considered a "bonus" by

        the field technicians "because if they finish[ed] early they [would] still get paid

---

        [3]  A helper assists the foreman on work, but does not lead the work himself.  Tr. I at 24
(Flynn).

th[e] same amount." *Id*. at 18-19.  When Mr. Collins calculated the piecework rate for the Navy Project, he was not aware that it was a Davis-Bacon job.  *Id*. at 19.

18.     Mr. del Villar testified that Mr. Collins offered him $400 to complete his part of the job in two days.  Tr. I at 60 (del Villar).  Mr. del Villar understood this was a "bonus."  *Id.*  He thought he would also receive his normal hourly rate, but he did not.  *Id.* at 61.

19.     During the Navy Project, Mr. del Villar complained to Mr. Flynn that other field technicians were not working hard enough and that he was doing more work than others on the job.  Mr. Flynn interpreted his complaints to be "kind of claiming that he was better than everybody else."  Tr. I at 28 (Flynn).  On investigation, Mr. Flynn came to believe that Mr. del Villar was "doing less work than the rest of the people," so he gave him an oral warning.  *Id.* at 29.

20.     Mr. del Villar reported this incident differently.  He testified that "Daniel"[4] was a Flynn employee on this job who did not want to work.  He described him as someone who kept "talking and playing,"  Tr. I at 76 (del Villar), but when Mr. del Villar complained to Field Supervisor Samuel Robles about Daniel, it "backfired on [him] because when [he] explained the situation [to] Samuel, Samuel . . . said it's not true."  *Id.* at 77.  Mr. del Villar believes that Mr. Robles was protecting Daniel because Mr. Robles is married to or lives with Daniel's sister.  *Id.*

---

[4]  Mr. del Villar could not recall "Daniel's" last name.

21.     Mr. del Villar asked Mr. Collins whether the Navy Project was subject to the

Davis-Bacon Act and Mr. Collins responded that Mr. Collins would talk to Mr.

Flynn.  *Id.* at 60.  Mr. del Villar never received an answer to his question.  *Id*. at

60-61.  Because it was a federal job, the Davis-Bacon Act did apply, in addition to

the FLSA, and required that all laborers be paid the "prevailing wage."

**E.  The U.S. Capitol Project**

22.     The U.S. Capitol Project began on June 23, 2008 and was completed on July 7,

2008.  Flynn Architectural employee Louis Mata was the foreman on this project.

Tr. I at 97 (del Villar).  Because it involved metal oxidizing, Mr. del Villar was

assigned to the job.

23.     At the start of the U.S. Capitol Project, Mr. Flynn visited the site and spoke with

Mr. del Villar.  Mr. Flynn asked Mr. del Villar what techniques and products "he

use[d] because oxidizing is a unique process and there's many ways that you can

oxidize metal."  Tr. I at 30 (Flynn).  Mr. Flynn did not get a satisfactory answer;

he testified that Mr. del Villar refused to tell him.  Mr. del Villar's lack of

transparency was of great concern to Mr. Flynn.  Mr. Flynn further testified:

> So if I ask him what he's using and he refuses to let
> me know, put yourself in my situation, can you
> imagine that? Someone saying humm, I'm not going
> to tell you what I use. Your mind is going to really
> race, really you're not going to tell me, what are you
> using? That's a legitimate concern from day one
> starting the oxidizing job.  If it wasn't for the fact
> that we had these jobs lined up he would have been
> dismissed that day. We just don't tolerate people not
> being team players and withholding, you know,
> critical materials. And if it was only water, why

didn't he tell me it was only water.

Tr. II at 143 (Flynn).

24.     Mr. del Villar recalled this same conversation, but placed it in Mr. Flynn's office,

In response to Mr. Flynn's question about what he was doing to perform

oxidizing, he recalls he answered "water":

> Q.  So your sole response was water?
> A.  Water, yeah.
> Q.  So when he asked you about your oxidation
> method, what exactly did you say?
> A.  He believed it was chemicals.  I said the secret is
> balanced water.  How much water you mix.

Tr. I at 67 (del Villar).

25.     In court, Mr. del Villar explained:

> "That's this word chemical, I don't know where it's coming
> from.  Because I had my trade for do the thing there, and he assumed
> this chemical there involved, but the company, his company is the one
> who furnish the chemical there.  I don't buy chemicals.  The only
> thing I had there was water." *Id*. at 65-66.  "What Mr. Flynn asked
> me was about the chemicals I mix there.  And there's no chemicals,
> it was water."

*Id*. at 80-81.  Nonetheless, he acknowledged,

> Q.  But when Mr. Flynn asked what it was you were
> doing, you refused to tell him, correct?  You told
> him it was a trade secret?
> A.  Yes.

*Id*. at 81.

26.     Further conversations between Mr. Flynn and Mr. del Villar were similarly

baffling to both sides.  Mr. Flynn remembered that "during one of the

conversations [Mr. del Villar] turn[ed] to Jason [Orzechowski, account manager

9

for Flynn] and said just like you wouldn't give away your customer lists, I'm not expected to give away my trade secrets." Tr. II at 148 (Flynn). This "dismissive" attitude led Mr. Flynn to think that "it was a game" to Mr. del Villar or "he thought he would be more valuable by having those secrets." *Id*. at 149. To the contrary, to Mr. Flynn, "it didn't make him valuable at all. [It m]ade him in my mind somebody who [Flynn Architectural] didn't want to work with." *Id.*

27.   Mr. Flynn found it important to know which materials and methods are used in the oxidization process because Flynn Architectural warranties all of its work; if the work "fails," Flynn Architectural is liable to redo it. Tr. I at 31 (Flynn). Secondly, Flynn Architectural was required to keep material safety data sheets regarding chemicals used at the job site. *Id*. at 44. These sheets describe the product or chemical used at the job site and state its hazards, proper usage, method of disposal, and similar information. Tr. II at 46 (Wingreen).

28.   Although refusing to reveal chemicals used on a project could be a serious offense at Flynn Architectural, Mr. del Villar was not dismissed during the U.S. Capitol Project. Mr. Flynn testified that he felt his "hands were tied." Tr. I at 39 (Flynn). Mr. del Villar's dismissal would have led to problems completing the oxidizing work at the U.S. Capitol and FBI Projects because it would have been  difficult to replace him. *Id* at 39-40. Mr. Flynn testified: "You just can't have somebody be trained in that in a day." *Id*. at 40.

29.   Mr. Flynn did not want to resort to using Mr. Robles, who was the only other person in the company who could perform oxidizing work, because he needed him

in his supervisory capacity.  *Id*. at 39.  Mr. Flynn testified he was also concerned

that Mr. Robles could not get a security clearance in time.  *Id*. at 39-41.  Mr. Flynn

testified:  "We were going to roll through it and then get the job done and then let

[Mr. del Villar] go."  *Id*. at 41.

30.     During the U.S. Capitol Project Mr. del Villar continued to be concerned with his

wage rates.  As an experienced metal refinisher, Mr. del Villar had worked on

several federal government jobs around Washington, D.C.  Tr. I at 54-55 (del

Villar).  He knew that he should have received a "government wage," either FLSA

minimum wage and overtime or Davis-Bacon wage rates, for such work.  While

working on the U.S. Capitol Project, he again asked Edison Collins about his

wage rate.  *Id*. at 64.   Mr. Collins again responded that he would talk to Mr. Flynn

but again never further reported to Mr. del Villar.  *Id*.[5]

**F.  FBI Project**

31.     Flynn Architectural was hired as a subcontractor under Desbuild, Inc., for a

project at the FBI building in downtown Washington, D.C., starting on July 8,

2008 (the day after the U.S. Capitol Project ended).  The FBI Project required

oxidization and Mr. del Villar was assigned to the job.  As before, he was paired

---

[5]  Mr. Collins carefully testified that he did "not specifically recall that now" when asked about wage inquiries from Mr. del Villar during the Navy and U.S. Capitol Projects.  Tr. II at 26-27 (Collins).  He admitted that it was "possible" that Mr. del Villar did ask about his wage rates. *Id.*  The Court concludes that Mr. Collins attempted to avoid acknowledging facts that he thought were injurious to Flynn Architectural's case but that such inquiries were, in fact, made by Mr. del Villar.  Given the close management team at Flynn Architectural, the Court also concludes that it is more likely than not that these inquiries were passed along to Mr. Flynn and that they explain why Ms. Wingreen checked the website of the Department of Labor on June 25, 2008, *after* the U.S. Capitol Project had begun, for the required Davis-Bacon rates.  Tr. II at 44-45 (Wingreen).

with Foreman Louis Mata.

32.     Scott Beland served as the Desbuild site superintendant on the FBI Project.  Tr. I
        at 101 (Beland).

33.     At the beginning of the project, Mr. del Villar asked whether Davis-Bacon wages
        were applicable to the FBI Project**.**  He asked Mr. Beland and understood from
        him that he should approach Paul Duggal, the construction quality control
        manager for the U.S. General Services Administration ("GSA") on the job.  Tr. I
        at 68-69 (del Villar); Tr. I at 101-102 (Beland).  Mr. Duggal testified that it was
        the responsibility of the general contractor's superintendent to ensure that required
        wages were paid to the laborers working on the FBI Project, but that he would
        look into such an issue if it were bought to his attention.  Tr. I at 108 (Duggal).

34.     Mr. del Villar went to Mr. Duggal on July 9 or 10 and told him he was "not being
        paid properly."  Tr. I at 109 (Duggal).  Mr. Duggal advised Mr. del Villar to talk
        first with his employer.  Tr. I. at 70 (del Villar); *see* Tr. I at 109 (Duggal)  ("I tell
        him to go talk to the owner of the company.  They'll take care of it.  They should
        take care of it.").  On July 11, Mr. del Villar asked Mr. Collins about the wage
        rates at the FBI Project but was only told, yet again, that Mr. Collins would speak
        to Mr. Flynn.  Tr. I at 70 (del Villar).

35.     Mr. del Villar returned to Mr. Duggal's office on July 14 and was given Form
        1445 to file his wage complaint.  Tr. I at 71 (del Villar); Tr. I at 109 (Duggal) ("I
        gave him a complaint form called 1445, labor report and I said attach your
        paystubs to it and bring me that back . . . .").  However, as Mr. Duggal

remembers, "[A]fter July 14[th], [Mr. del Villar] never brought the form, never brought the paystubs, never responded." *Id*. at 110.  Mr. del Villar testified that he brought the Form 1445 back to Mr. Duggal at the end of the day on July 14, when Mr. Duggal had already left for the day, and that Michael Foy, Desbuild's project manager, opened the office and dropped the form on Mr. Duggal's desk. Tr. I at 71 (del Villar).  Although his testimony was somewhat shaky and uncertain, Mr. Duggal either never received, or never realized that he had received, the completed Form 1445 from Mr. del Villar.  Tr. I at 111 (Duggal).

36.     Other events related to Mr. del Villar's oxidizing work on the FBI Project were overtaking his wage concerns.  At the end of the second day on the FBI Project (Wednesday, July 9), Louis Mata and another Flynn Architectural employee on the project, Herbert Zeldiva, both complained to Samuel Robles that Mr. del Villar was mixing outside products to perform his oxidizing work.  Mr. Robles recounted: "Mata and Herbert. . . say he don't use our stuff.  I said what stuff he use?  They say he uses his own product."  Tr. I at 177 (Robles).

37.     Mr. Robles testified that he questioned Mr. del Villar about what oxidizing products he was using and Mr. del Villar responded that "he got his own formula to do it" and that he didn't want to tell anybody what he used to mix the chemicals.[6]  *Id.* at 177-78.  Mr. Robles reported this conversation to Mr. Flynn.

---

[6] Mr. del Villar denied that Mr. Robles ever asked him what products he was using in his oxidizing work.  Tr. I at 81 (del Villar).  The Court credits Mr. Robles's account of this conversation.  Mr. Robles testified in a straightforward manner without hesitation, and there is no reason to discount his memory.  In contrast, Mr. del Villar testified inaccurately on occasion to bolster his case.  See ¶ 41.

*Id*. at 187.  Mr. Flynn recalled that Mr. Robles informed him of this issue on July

14th, while Mr. Robles recalled he relayed the conversation to Mr. Flynn on July

9, when it occurred.  Tr II at 128 (Flynn); Tr. I at 187 (Robles).  The precise date

is not important; the Court finds that Mr. Flynn was apprised of complaints about

Mr. del Villar during the FBI Project before his decision to discharge Mr. del

Villar.

38.    On Monday, July 14, according to Ms. Wingreen, she overheard Mr. Mata

complaining in Flynn Architectural's office about Mr. del Villar.  She testified

that she herself turned to Mr. del Villar and demanded to know what chemicals he

was using on the FBI Project and whether he was mixing them at home or on the

job site.  In court, she complained that "that's when he gave me his customary

smirk and said it's my secret."  Tr. II at 85 (Wingreen).  Ms. Wingreen's report in

this regard is highly suspect; Mr. del Villar discounted her status, considering her

only the "counter for the company," which very obviously rankled Ms. Wingreen.

Tr. II at 179 (del Villar).  Ms. Wingreen readily testified that "from the first day[,]

I knew that there was going to be issues because he does seem to have an

arrogance and an attitude about him that I did not appreciate."  Tr. II at 86

(Wingreen).  Given Ms. Wingreen's demeanor that clearly revealed her

unsupported bias against Mr. del Villar, the Court discounts much of her

substantive testimony.  It is probably accurate, nonetheless, that on Tuesday, July

15, she told Mr. Flynn "how irritated [she] was with David's attitude, his

insubordination."  *Id*. at 89.

39.     After hearing these complaints, Mr. Flynn immediately became concerned again

about Mr. del Villar's failure to disclose his oxidization method.  He testified that

"we kept giving him chances, . . .  tell us what  you're using and he kept being

very dismissive with this . . . .  I mean, it was very frustrating."  Tr. II at 137-38

(Flynn).

40.     Mr. Flynn spoke about Mr. del Villar with Mr. Robles and other managers at

Flynn Architectural on Tuesday, July 15.  He asked Mr. Robles if he could finish

the FBI Project if Mr. del Villar were fired.  *Id*. at 138.  On that day or the next,

Mr. Flynn discussed discharging Mr. del Villar again with Mr. Robles and with

Mr. Orzechowski.  *Id*. at 159-160.  Mr. Flynn also talked with Mr. del Villar about

what materials he was using on the FBI Project.  *Id*. at 160 (accepting Mr. Flynn's

deposition testimony that Flynn gave del Villar "an opportunity that day to tell

you what he was using on site" in the office with Messrs. Robles and

Orzechowski in attendance).

41.     On the morning of July 17, 2008, before anyone left for the FBI Project site, Mr.

Flynn called Mr. del Villar into his office and fired him.  The parties stipulated

that Mr. Flynn "told Mr. del Villar that the reason for his termination was that Mr.

del Villar did not get along with his co-workers and that he would not tell Flynn

Architectural which chemicals he used to perform his oxidizing work."  *See*

Stipulations, *supra* ¶ 4.  At trial, however, Mr. del Villar testified that Mr. Flynn

"said just you need to go.  That's when I asked why, that's you talk too much,

government wage, that's it."  Tr. II at 183 (del Villar) (unchanged original).  In the

face of the Stipulation and credibility problems with Mr. del Villar's occasional

exaggerations, the Court does not credit Mr. del Villar's description of his

conversation with Mr. Flynn on July 17.

42.     Ultimately, it was Mr. Robles who completed the oxidizing work on the FBI

Project.  Tr. I at 40 (Flynn).  Mr. Robles testified that he already had the requisite

security clearance to work on the job site because he was already the supervisor.

Tr. I at 192 (Robles).  Thus, Mr. Flynn's concerns that Mr. Robles would not be

able to obtain the requisite security clearance to complete the job in a timely

manner were unfounded.  Nonetheless, the Court credits Mr. Flynn's explanation

that he was reluctant to have Mr. Robles complete oxidizing work because he was

Flynn Architectural's only supervisor and was needed in that capacity.  *See* Tr. I at

41 (Flynn).

### G. Mr. Flynn's Knowledge of Mr. del Villar's Wage Complaints

43.      There is conflicting testimony as to whether Mr. Flynn had any knowledge of Mr.

del Villar's complaints to Mr. Duggal before firing him.  Mr. del Villar has

asserted that he spoke, alone, with Mr. Flynn on July 16 at the end of the workday

and informed Mr. Flynn that he was filling out the wage complaint form from Mr.

Duggal but that he wanted to try to resolve the situation with Mr. Flynn first.[7]  Tr.

I at 72 (del Villar).  Mr. Flynn denied that any such conversation took place.  Tr. I

at 41 (Flynn).

------

[7]  This testimony must be viewed skeptically since Mr. del Villar also testified that he had
already submitted the wage complaint form to Mr. Duggal's office.

44.     Mr. Duggal testified that he spoke with Mr. Flynn regarding Mr. del Villar's

wage complaints, either on or before July 17.  Tr. I at 113-15 (Duggal).  Mr. Flynn

recalled that this conversation took place on the afternoon of July 17 (after he had

fired Mr. del Villar) and that Mr. Duggal did not mention Mr. del Villar's wage

complaints during their conversation.  Tr. II at 127 (Flynn).  Mr. del Villar's

memory is different.  Mr. del Villar testified that he went to the FBI Project after

his discharge on July 17 to talk to Mr. Duggal.  Tr. I at 78 (del Villar).  Upon

hearing that Mr. del Villar had been fired, Mr. Duggal picked up the telephone

and called Mr. Flynn.  Mr. Duggal reportedly told Mr. Flynn that he should re-hire

Mr. del Villar or there would be trouble.  *Id*. at 78-79 (testifying that Mr. Duggal

said that "Mr. Flynn couldn't fire me because I asked about the Government wage

. . . [and said] [y]ou need to hire David again.").

45.     The Court does not credit any parties' full recitation of these events as both Mr.

del Villar's and Mr. Flynn's testimony on point seemed designed more to support

their respective arguments than to recall the event accurately and Mr. Duggal had

continuing and obvious difficulties reconstructing events.  Tr. I at 113 (Duggal).

However, the one clear contact between Mr. Duggal and Mr. Flynn, to which both

parties agree, occurred after Mr. del Villar's discharge.

**H. Wage Payments**

46.     Because of Flynn Architectural's lack of experience with Davis-Bacon jobs, there

were, in fact, errors calculating the correct wages for Mr. del Villar based on the

wage scales issued by DOL, and Flynn Architectural sent Mr. del Villar several

checks to correct these issues.  Tr. II at 56-57 (Wingreen)

47.     Employers obtain hourly rates that comply with the Davis-Bacon Act from DOL's

        website.   Ms. Wingreen printed rates found on the DOL's website on June 25,

        2008 during the Navy Project, and she did not check the rates again to assure that

        they were correct for the time period that Mr. del Villar worked for Flynn.  *Id*. at

        74.

48.     Except for probationary employees, who do not receive fringe benefits during

        their first six months with Flynn Architectural, all field technicians were paid an

        hourly rate-plus-benefits that satisfied Davis-Bacon requirements on the three

        federal jobs at issue in this case.  Mr. del Villar was the only employee on the

        three federal contracts whose pay from Flynn Architectural did not include fringe

        benefits because of his probationary status.  Tr. II at 45-46 (Wingreen).

49.     However, Mr. del Villar was entitled to compensation in lieu of fringe benefits

        when he worked on Davis-Bacon jobs.  After Mr. del Villar was terminated, Ms.

        Wingreen learned that the monies paid to Mr. del Villar for the U.S. Capitol

        Project covered the base rate required by Davis-Bacon, but not its fringe benefits

        component.  *Id*. at 56.  Ms. Wingreen also realized that Mr. del Villar was not

        paid for fringe benefits during the FBI Project.  *Id*.  Ms. Wingreen corrected Mr.

        del Villar's last paycheck to ensure that he received the correct wage, and sent

        him two extra checks to cover the monies he was owed from the U.S. Capitol

        Project and from his first week of work on the FBI Project.  *Id*.

50.     In addition, after this litigation was filed, Ms. Wingreen again reviewed the lump

sum Mr. del Villar was paid in conjunction with the Navy Project.  She realized

that the piecework amount paid to Mr. del Villar did not cover all monies he was

owed because it did not account for time-and-one-half overtime for working more

than 40 hours in that week.  *Id*. at 57.  Mr. del Villar received a check from Flynn

Architectural for $95.64 in June 2010 to account for this error.  *See* Pl.'s Ex. B.

## II. LEGAL STANDARD

### A. Fair Labor Standards Act

Mr. del Villar complains that his discharge was based upon his wage complaints

and, therefore, violated the FLSA. This federal statute establishes minimum wages and

requirements for overtime pay.  *See Kasten v. Saint-Gobain Performance Plastics Corp*., 131 S.

Ct. 1325, 1329 (2011).  The FLSA makes it

> unlawful to discharge or in any other manner discriminate against any
> employee because such employee has *filed any complaint* or instituted
> or caused to be instituted any proceeding under or related to this
> chapter, or has testified or is about to testify in any proceeding, or has
> served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3) (emphasis added).  To establish a retaliation claim under the FLSA, a

plaintiff is required to show that (1) he made an FLSA complaint or otherwise engaged in

protected conduct; (2) the defendant was aware that he had engaged in protected activity; (3) the

defendant took an action that was materially adverse to the complainant and sufficient to

dissuade a reasonable employee from further protected activity; and that (4) there was a causal

relationship between the two.  *See Caryk v. Coupe*, 663 F.Supp. 1243, 1253 (D.D.C.1987).

Once a plaintiff has established a prima facie case, the burden shifts to the

defendant to show a legitimate, nondiscriminatory reason for the alleged materially adverse

action.  *Murtagh v. Rosenker*, 601 F. Supp. 2d 64, 72 (D.D.C. 2009) (stating that courts should look to Title VII cases to interpret the FLSA and adopting the burden-shifting framework for Title VII cases established in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973)); *see also Caryk*, 663 F. Supp. at 1254 (same).   If the defendant comes forward with such evidence, then the plaintiff must prove, by a preponderance of the evidence on the record as a whole, that the legitimate reasons offered by the employer were not its true reasons and were a pretext for discrimination.  *McDonnell Douglas*, 411 U.S. at 804.

### B. Rule 15

Mr. del Villar also seeks to amend his Complaint under Rule 15 of the Federal Rules of Civil Procedure to include a claim for lost wages under the D.C. Wage Payment and Collection Law ("DCWPCL").   Rule 15(b) provides that pleadings can be amended, during and after trial if: 1) evidence is raised outside of the issues raised in the pleadings and permitting the pleadings to be amended "will aid in presenting the merits"; 2) an issue is tried by the parties' consent.  Fed. R. Civ. P. 15(b).

"Trial of [an] issue without objection normally is enough to satisfy the Rule 15(b) requirement."  *Kirkland v. Dist. of Columbia*, 70 F.3d 629, 633 (D.C. Cir. 1995).  If evidence is introduced without objection or if the non-moving party produced evidence bearing on the issue, consent to amend is present.  *Id*. (citing Charles A. Wright *et al.*, Federal Practice and Procedure § 1493, at 20-24 (1990)).

### III. ANALYSIS

### A. Mr. del Villar's Termination

#### 1. Mr. del Villar's Protected Activity.

The first question is whether, and when, Mr. del Villar engaged in protected FLSA activity, *i.e.*, "filed any complaint or instituted . . . any proceeding . . . or testified . . . in any such proceeding" under the Act.  29 U.S.C. § 215(a)(3).  An individual has "filed a complaint" within the meaning of the FLSA when "the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns."  *Katsen*, 131 S. Ct. at 1334.  Oral complaints are sufficient to satisfy the FLSA's requirement that a complaint be "filed."  *Id*. at 1336.   "To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."  *Id*. at 1335. "[A] complaint is filed when a reasonable, objective person would have understood the employee  to have put the employer on notice that [the] employee is asserting statutory rights" under the FLSA.  *Id*. (internal quotation marks omitted).

The FLSA states that "it is unlawful to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this [Act]."  29 U.S.C. § 215(a)(3).  By these terms, the FLSA anti-retaliation provision limits itself to complaints related to FLSA protections.  Thus, the FLSA does not provide coverage for retaliation due to Davis-Bacon wage complaints.

It is clear that Mr. del Villar questioned his wage rate on the three federal projects by raising the issue with Mr. Collins.  In regards to the Navy Project,  Mr. del Villar testified that his wage inquiries concerned Davis-Bacon wage rates.  With respect to the U.S. Capitol Project

and the FBI Project, Mr. del Villar's testimony is more ambiguous as he testified that he asked about the "government wage."  Tr. I at 64, 70 (del Villar).

It is also clear that his questions were understood by Flynn Architectural: they caused Ms. Wingreen to look at the DOL website after his first inquiry in late June 2008 to ascertain the relevant Davis-Bacon base rate (although she neglected to take the value of fringe benefits or time-and-a-half overtime pay into account). The question about wage rates in late June 2008 did not cause Mr. Flynn to discharge Mr. del Villar.  Based on Ms. Wingreen's review of the DOL website, Flynn Architectural mistakenly concluded that it was paying Mr. del Villar an appropriate rate in compliance with Davis-Bacon and it never looked again until after his termination.  In other words, Mr. Flynn had no reason to be concerned about Mr. del Villar's question and did nothing to affect Mr. del Villar's job after he learned of it.

However, Mr. del Villar's complaints did not stop at Mr. Collins.  The Court finds that Mr. del Villar "filed a complaint" within the meaning of the FLSA when he talked to Mr. Duggal of GSA.  During their second conversation, Mr. Duggal was undoubtedly aware that a grievance had been lodged as he gave Mr. del Villar a complaint form and asked him to return it with his pay stubs.  It is not disputed that Mr. Duggal was an on-site GSA representative and that it was part of his job function to deal with wage complaints. What is unclear is whether Mr. Duggal understood Mr. del Villar's complaint as a complaint under the FLSA or under Davis-Bacon.  Mr. Duggal recalled only a general complaint from Mr. del Villar that "he was not being paid properly."  Tr. II at 109 (Duggal).   The Court resolves the ambiguity surrounding Mr. del Villar's complaint to Mr. Duggal by finding it to have been consistent with his Complaint here, and that he filed a complaint under the FLSA.

22

However, the record does not support a finding that Mr. Flynn knew that Mr. del Villar had filed a complaint with Mr. Duggal.  Mr. del Villar's only evidence was his own testimony, which was internally inconsistent and which the Court does not credit on this point. Mr. Duggal was unable to offer any support.  Honorable and upright as he is, Mr. Duggal was unable at this stage in his life to remember the details of these events with any clarity.  He knew that he talked to Mr. Flynn on at least one occasion – but the one occasion, that was recalled by both Mr. del Villar and Mr. Flynn happened *after* the discharge.  Mr. Flynn denied any contact with Mr. Duggal in which the latter communicated a wage complaint on behalf of Mr. del Villar and Mr. Duggal was unable to remember clearly enough to agree or disagree.  There is, thus, no credible evidence that Mr. Flynn knew of Mr. del Villar's complaints to Mr. Duggal.

Nonetheless, the timing of Mr. del Villar's contact with Mr. Duggal and his discharge could support an inference of a causal connection between the two so the Court moves to the next stage of the analysis.  Upon review of the entire record, the Court finds that Flynn Architectural has shown that it had non-discriminatory reasons for its termination of Mr. del Villar and that Mr. del Villar has failed to show that these reasons were false or a pretext for discrimination.

### 2. Mr. del Villar's Termination.

The parties stipulated to the reasons given by Mr. Flynn when he discharged Mr. del Villar:  1) Mr. del Villar could not get along with other employees; and 2) Mr. del Villar would not disclose which materials he was using to oxidize metals on Flynn Architectural jobs. Unfortunately, these concerns were based upon mis-communications between Mr. del Villar and his fellow employees and Mr. Flynn.   Whether the mis-communications were caused by

language differences or cultural differences or employee jealousy, they were obvious throughout the record.

Mr. del Villar completely missed the point of Mr. Flynn's questions about "chemicals." Knowing that the only "chemical" he used was Jax, supplied by Flynn Architectural itself, Mr. del Villar answered that it was a question of "balanced water" and was his "trade secret." Mr. Flynn did not explain to Mr. del Villar what he explained in court:

> I want[ed] to make sure that the way he is performing, he is a new employee of our company, and one of the reasons I try not to hire people from other companies is because they come with their own set of ways to do things. And I would rather hire someone and train them our way so when we have somebody new, it's very appropriate for me to say how do you approach this?

Tr. II at 147 (Flynn). Mr. del Villar is obviously proud of his trade skill but failed to understand the import of the questions, repeatedly gave an accurate but incomplete response, and refused to explain further. Despite multiple questions from multiple people, he never explained that he merely mixed water with Jax, in differing quantities according to his experienced judgment of the conditions and results to be obtained. Instead, he became more obstinate about it. This mis-communication continued throughout his tenure with Flynn Architectural.

A failure to communicate also explains why Mr. del Villar never understood the nature of the piecework pay system for the Navy Project which led to his irritation and complaint about his fellow technicians. Believing that other employees left early, leaving him to work longer hours without their assistance, he complained to Mr. Flynn that he did more work than they. In fact, he worked longer hours but did not do more than half the work. The cause of Mr. del Villar's irritation was not evident to Mr. Flynn – who understood the piecework pay system – and he came away with the negative impression that Mr. del Villar was unable to work without

disagreements with his colleagues.  This impression was further exacerbated by reports from Mr.

Robles that Mr. del Villar was giving him problems in the field regarding his materials and

colleagues and from Ms. Wingreen regarding Mr. del Villar's "insubordination."

       While the reasons for firing Mr. del Villar were based upon mis-communication,

they were real and provide a non-retaliatory basis for termination.

### 3. Alleged Pretext

       Mr. del Villar argues that the reasons given by Defendants must be pre-textual

because "Defendants were aware that Plaintiff had been asking about Davis Bacon wages going

back to the first Davis Bacon job he was staffed on."  Pl.'s Post-Trial Br. [Dkt. 41] at 19.  This

claim does not support Mr. del Villar's case, as he points to no provision under Davis-Bacon for

a private cause of action for retaliatory discharge.[8]  Mr. del Villar further relies on the time-line

of events to make his case, specifically that Messrs. Flynn and Collins were aware that he was

making wage complaints but did not fire him until he went outside the company to complain to

Mr. Duggal.  The timing is, indeed, suspect.  But in the absence of credible evidence that Mr.

Flynn knew that Mr. del Villar had contacted Mr. Duggal *before* the discharge, this suspicious

timing is insufficient to carry Mr. del Villar's burden of proof.  In addition, shortly before the

termination, Mr. Flynn was again alerted to Mr. del Villar's coy responses to questions about his

use of "chemicals," was advised by Mr. Robles that fellow employees were complaining about

---

    [8]  The Davis-Bacon Act provides that a contracting federal agency will withhold accrued
payments from a contractor that fails to pay Davis-Bacon wages.  *See* 40 § 3142(c)(3).  It allows
a private right of action against the contractor or its sureties where these withheld payments do
not satisfy the wages owed to an employee.  *Id*. at § 3144(a)(2).  No other private right of action
is provided by the statute. *But see McDaniel v. University of Chicago*, 548 F.2d 689 (7th Cir.
1977).  When Congress wishes to provide a private damages remedy, it knows how to do so and
does so "expressly."  *Universities Research Ass'n, Inc. v. Coutu*, 450 U.S. 754, 773 (1981).

Mr. del Villar, and was advised by Ms. Wingreen that Mr. del Villar had been insubordinate. The fact of these reports is credited by the Court.  They immediately preceded the termination and explain the suspect timing.

Mr. del Villar also argues that the Defendants have not presented sufficient evidence of any wrong-doing on his part.  He is right in one respect: the evidence does not show that Mr. del Villar was in fact mixing unknown chemicals on the job site or that Mr. del Villar was deliberately trying to provoke his work colleagues.  However, it does show, due to a series of mis-communications, that Mr. Flynn honestly believed this was the case.  His testimony in this regard was clear, credible and supported by his contemporaneous statements and the parties' stipulation.

Mr. del Villar contends that Mr. Flynn should not be credited because Mr. Flynn testified that he was concerned with Mr. del Villar's work as early as June, but did nothing about it until after Mr. del Villar spoke to Mr. Duggal in mid-July.  As finder of fact, the Court credits Mr. Flynn's testimony that completing the oxidizing work on the U.S. Capitol and FBI Projects stayed any thought of firing Mr. del Villar in June.  Further complaints from his managers about Mr. del Villar and Mr. Flynn's own last, unsuccessful, attempt to learn what "chemicals" were in use by Mr. del Villar changed that calculation.

The Court concludes and finds that Mr. del Villar's wage complaints – whether under the FLSA *or* Davis-Bacon – were not the cause of his discharge from Flynn Architectural.

**B.  D.C. Wage Payment and Collection Law**

The D.C. Wage Payment and Collection Law allows liquidated damages when an employee is not paid all "wages earned" within four days of a discharge.  D.C. Code § 32-

1303(1).[9]  As reflected above, Ms. Wingreen testified during trial that she consulted the DOL

website for Davis-Bacon wage rates in June 2008 and verified that Mr. del Villar's base hourly

rate was sufficient.   However, Ms. Wingreen did not account for the Davis-Bacon requirement

that an employer compensate an employee for the cost of the fringe benefit component of the

Davis-Bacon rate and she did not check the official rates to see whether the rates had increased

from the rate she used to pay Mr. del Villar.  Based on the latter, Mr. del Villar argued again that

Flynn Architectural had violated the D.C. Code wage provisions because it certified an incorrect

rate.  Tr. II at 71.  Defendants ultimately agreed that if Mr. del Villar were actually underpaid

based upon an incorrect Davis-Bacon scale, he was owed the correct amount.  *Id*. at 73.

       The Court finds that the pleadings were amended during trial with the consent of

the parties to add a claim for unpaid wages based on the use of the incorrect "prevailing wage"

scale.  *See* Fed. R. Civ. P. 15(b)(2).  The Court directed the parties to present the correct wage for

inclusion in its order.  Tr. II at 73.  However, the Court has received no briefing or evidence from

Mr. del Villar regarding the correct amount of missing wages, if any, and the correct wage

remains in dispute.[10]  Consequently, the Court will dismiss this claim for failure to prosecute.

---

[9]  Mr. del Villar sought to add this claim to an amended complaint right before trial and again during trial.  On both occasions, the Court denied his motion because it was untimely and unduly prejudicial to the Defendants.

[10]  At trial, Mr. del Villar attempted to introduce a sheet from the DOL website which listed $25.31as the hourly wage for metal refinishing as of July 4, 2008 with a fringe benefit rate of $7.56.  *See* Court Ex. 2.  Defendants objected because counsel had not been shown the document earlier and could not compare it to Flynn Architectural records on the fly. It remained unclear whether additional monies were due to Mr. del Villar but he has not filled in the gap in over a year.  Tr. II at 72.

**IV. CONCLUSION**

Whether the barrier was language, culture or otherwise, the record demonstrates a distinct series of mis-communications between David del Villar and his employer.  It was the failures to understand each other (on both sides) that led to Mr. del Villar's termination, not his wage complaints.   In addition, Flynn Architectural has demonstrated a legitimate, non-retaliatory reason for its actions.  Judgement will be entered in favor of Defendants on Count II of the Complaint and Plaintiff's claim under the D.C. Wage Payment and Collection Law will be dismissed, with prejudice, for failure to prosecute.   A memorializing Order accompanies this Opinion.


Date: September 28, 2012                              _____/s/_____
                                                       ROSEMARY M. COLLYER
                                                       United States District Judge